UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LAWRENCE FANNALY, III** | **CIVIL ACTION** |
| **VERSUS** | **NO: 20-1940** |
| **LEI, INC.** | **SECTION: "S" (4)** |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that plaintiff's **Motion to Remand** (Rec. Doc. 9) is **GRANTED**, and this matter is **REMANDED** to the Civil District Court for the Parish of Orleans.

## BACKGROUND

Plaintiff worked for the defendant from 1999 to 2005, when he left voluntarily for a sales position at a larger company. In February 2009, plaintiff was recruited to return to defendant as Vice-President of Sales & Operations. He accepted a salary of $70,000 per year, a significant pay cut from his previous job, with the understanding that bonus compensation and participation in a phantom stock appreciation plan ("PSAP") were the primary components of his annual compensation. The PSAP provided additional compensation based on plaintiff's work to increase the company's value. Plaintiff contends he was never told that the phantom stock plan was intended as retirement income, but that it was additional income when he chose to leave the company or the company was sold.

The amounts due to plaintiff under the PSAP were accounted for as a monthly expense by defendant, not paid directly to him, but recorded as a bookkeeping entry on his behalf.

Defendant also took a compensation deduction on its federal tax return each time it credited the PSAP account and withheld Medicare taxes on the PSAP amount. The annual increase of plaintiff's earned wages pursuant to the PSAP was reported as income on plaintiff's W-2 as "Medicare wages and tips" and plaintiff paid Medicare taxes on that amount each year.

Defendant's founder, Lynn MacDonald, died in 2018, and control of the company was assumed by the Board of Trustees for the Lynn T. and Lindalee MacDonald Living Trust U/A/D January 21, 2008 (the "Board"). The Board decided to sell the company and reached an agreement with a purchaser in 2019. Plaintiff assisted with the purchase process for defendant. During the sale process, issues were raised that caused defendant to spend a considerable amount on attorney's fees and other expenses. As well, for the first time, the Board became much more active in decisions affecting the operation and profitability of the company. According to plaintiff, those decisions, and the fees incurred by defendant during the sale, negatively affected defendant's profits, significantly reducing plaintiff's income. As a result of the reduction in plaintiff's income, and the Board's unwillingness to cooperatively work for what plaintiff believed to be the company's best interest, on November 1, 2019, plaintiff provided 60 days' notice that he was voluntarily resigning. Despite the fact that the terms of his Employment Agreement made his resignation effective immediately, plaintiff continued to assist defendant during the notice period, which concluded on December 31, 2019.

On November 26, 2019, the defendant presented plaintiff with a Separation Agreement and General Release, which would have paid him all of the amounts he was owed under the PSAP and engaged him as a consultant going forward. However, the proposed agreement was

conditioned, inter alia, upon a new non-competition agreement, and plaintiff declined to sign it. Plaintiff claims that in retaliation for his failing to sign the agreement, and in an effort to avoid paying plaintiff amounts due him under the PSAP, defendant terminated plaintiff's employment, allegedly for cause, on December 30, 2019, 59 days after plaintiff's 60 day notice of resignation.

Maintaining that plaintiff was terminated "for cause," defendant refused to pay the amounts due under the PSAP. Plaintiff alleges that this termination for cause was ineffective because it came two months after he provided his notice of resignation, and further, that the termination does not comply with the applicable provisions of the PSAP, which requires an opportunity to cure any alleged cause for termination within thirty days.

Following defendant's refusal to pay the amounts due under the PSAP, plaintiff filed the instant suit in the Civil District Court for the Parish of Orleans, seeking the payment of unpaid wages pursuant to La. R.S. 23:631 and alternatively, for breach of contract. Defendant removed the case to this court, alleging that the PSAP is an employee pension benefit plan, specifically a non-qualified top hat deferred compensation plan governed by ERISA, and plaintiff's claim to recover deferred compensation benefits under the PSAP is one for benefits under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). Therefore, defendant contends that plaintiff's asserted state law claims are preempted by ERISA. Plaintiff has filed the instant motion to remand arguing that his state law claims are not preempted because the PSAP is not a plan as defined by ERISA and case law interpreting it.

## APPLICABLE LAW

*Remand Standard*

Motions to remand to state court are governed by 28 U.S.C. § 1447(c), which provides that "[i]f at any time before the final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." The removing defendant bears the burden of demonstrating that federal jurisdiction exists and therefore that removal was proper. Jernigan v. Ashland Oil, Inc., 989 F.2d 812, 815 (5th Cir. 1993).

In assessing whether removal is appropriate, the court is guided by the principle, grounded in notions of comity and the recognition that federal courts are courts of limited jurisdiction, that removal statutes should be strictly construed. See Manguno v. Prudential Prop. & Cas. Ins. Co., 276 F.3d 720, 723 (5th Cir.2002). Doubts regarding whether federal jurisdiction is proper should be resolved against federal jurisdiction. Acuna v. Brown & Root, 200 F.3d 335, 339 (5th Cir. 2000). The removing defendant bears the burden of demonstrating that federal jurisdiction exists and therefore that removal was proper. Jernigan v. Ashland Oil, Inc., 989 F.2d at 815.

*Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA')*

At issue in this case is whether the Phantom Stock Appreciation Plan that plaintiff participated in is an employee benefit plan under ERISA. To determine whether a particular employee benefit qualifies as an employee benefit plan under ERISA, courts apply a three-part test asking "whether a plan: (1) exists; (2) falls within the safe-harbor provision established by the Department of Labor; and (3) satisfies the primary elements of an ERISA 'employee benefit

plan'—establishment or maintenance by an employer intending to benefit employees." Cantrell v. Briggs & Veselka Co., 728 F.3d 444, 448-49 (5th Cir. 2013) (quoting Meredith v. Time Ins. Co., 980 F.2d 352, 355 (5th. Cir. 1993)). It is the first element, the existence of the plan, at issue in this case.

Whether a plan exists is fact-specific. Cantrell, 728 F.3d at 449. Under Fifth Circuit jurisprudence, a plan exists "if from the surrounding circumstances, a reasonable person could ascertain the intended benefits, a class of beneficiaries, the source of financing, and the procedures for receiving benefits." Mem'l Hosp. Sys. v. Northbrook Life Ins. Co., 904 F.2d 236, 240–41 (5th Cir. 1990) (quoting Donovan v. Dillingham, 688 F.2d 1367, 1374 (11th Cir. 1982)(en banc)). In addition, "[i]n its seminal decision laying out the requirements for the existence of ERISA plans, Fort Halifax Packing Company, Inc. v. Coyne, the Supreme Court held that in order to constitute an ERISA plan, a program must necessitate the existence of 'an ongoing administrative program to meet the employer's obligation.'" Cantrell, 728 F.3d at 448 (quoting Fort Halifax, 482 U.S. 1, 11 (1987)).

In the present case, the court is called upon to determine whether a reasonable person could ascertain the procedures for obtaining benefits under the the PSAP, and whether the PSAP necessitated an "ongoing administrative program to meet the employer's obligation."[1]

Under the PSAP, plaintiff (the only PSAP participant) was entitled to receive a percentage of the phantom stock appreciation which graduated from 3% at the inception of the plan in 2011, up to a maximum of 15% in 2012 when the percentage capped out, remaining at

---

[1]The other elements are not seriously disputed by the parties.

15% going forward. The amounts vested on the award date each year (December 31 of each year), and were due and payable upon either the plaintiff's termination for reasons other than cause, a change in company control, the employee's death, or disability. The phantom stock appreciation value was determined by a fixed formula calculated by taking the amount of the company's appreciation (or depreciation) in a given plan year, which in turn was determined by subtracting the beginning annual value from the ending annual value. That amount was multiplied by the phantom stock appreciation percentage specified for the given year. The PSAP agreement included a fixed methodology for calculating both the beginning and ending annual value. The PSAP was established in 2011 and maintained until 2019, when plaintiff's employment was terminated. It does not include any specific provisions or a procedure to obtain payments under the plan or appeal a decision concerning the plan.

*Arguments of the parties*

In moving for remand, plaintiff contends that there is no ongoing administration obligation, because once the triggering event as defined by the PSAP occurs, the benefit amount is calculated by a straightforward formula set forth in the PSAP, which does not require any discretion but is simply a mechanical mathematical computation. Once determined, it is paid in a lump sum or three equal payments, and plaintiff argues under Fort Halifax that one time or limited payments do not require any ongoing administrative program, because the defendant has not assumed an ongoing responsibility to process claims and pay benefits "on a regular basis" and "faces no periodic demands on its assets that create a need for financial coordination and control." Lettes v. Kinam Gold, Inc., 3 Fed. Appx. 783, 788 (10th Cir. 2001). Further, plaintiff

emphasizes that defendant has admitted that the plan has concluded, because he was the only participant and has been terminated; thus, there can be no "ongoing administrative scheme."

Plaintiff further argues that the provision in the PSAP requiring a determination of whether his termination was for cause is not enough to transform the agreement into an ERISA plan, especially in cases such as this in which "cause" is defined in the PSAP and limited to the employee's conviction of a felony or willful and continued failure to perform participant's duties or willful misconduct.

Plaintiff also argues that the PSAP was not established as an ERISA plan because it includes no procedures for obtaining benefits. Finally, plaintiff notes that ERISA is nowhere mentioned in the PSAP and points to language in the PSAP providing that it shall be construed under Louisiana state law.

Defendant's arguments against remand focus on its contention that the PSAP involves an ongoing administrative scheme because it was memorialized in an eleven-page document separate from plaintiff's employment agreement and contains twenty-two defined terms and numerous provisions including a requirement that a determination be made as to whether the participant's termination was for cause. Defendant further notes that the PSAP envisions four scenarios that permit the payment of benefits, i.e., termination of employment (other than for cause), death, disability and a change in control, and that it was in effect for over eight years and, but for plaintiff's termination, would have continued as an ongoing plan. Acknowledging that the PSAP payments were to be paid in a lump some or three annual installments following and depending upon the triggering event, defendant claims that to determine the amounts due

7

required a complex set of ongoing calculations that were conducted every year.

With respect to the question whether the plan provides a procedure for claiming benefits, defendant argues that because Dillingham does not require a writing, a written procedural mechanism is not required, and plaintiff could infer from the circumstances how to claim benefits.

## DISCUSSION

***The PSAP does not involve an ongoing administrative scheme***.

Defendant has characterized the PSAP in this case as a deferred compensation program.[2] The PSAP is memorialized in a written plan that requires a once per year calculation of value appreciation, multiplied by a specified percentage, and reflected as a bookkeeping entry on the employer's books, and payable on termination, death, disability, or a change in control. Under the PSAP, one or three equal payments is made upon death, disability, or termination of the employee. The PSAP, for which plaintiff was the sole participant, ceased to exist upon plaintiff's

---

[2]Despite defendant's characterization of the PSAP as a deferred compensation plan, it is actually a hybrid, containing features of a bonus plan (calculated based on the company's performance), a severance plan (payable upon death, disability, a change in control, or termination), and deferred compensation (moneys are earned and partially taxed during employment and payable at termination). The court notes that phantom stock plans usually constitute a type of bonus program expressly excluded from ERISA coverage by federal regulation. See In re Enron Corp. Sec., Derivative & ERISA Litig., 284 F. Supp. 2d 511, 531 n. 2 (S.D. Tex. 2003) (citing 29 C.F.R. § 2510.3-2) ("In contrast to a pension benefit, a bonus plan does not proffer retirement income, but functions for another purpose, such as increased compensation for an incentive or a reward for good work.").While this case differs from the phantom stock plans expressly excluded from ERISA, in that those plans contemplate awards being made pre-termination, it is still true that the design of the instant PSAP, linked to the company's performance, suggests that it is more in the nature of a bonus plan to reward performance than a retirement plan to guarantee income during retirement.

termination. The question to be resolved is whether the mechanics involved in this plan can be said to amount to an "ongoing administrative scheme."

The facts in this case are not as cut and dry as those presented in Fort Halifax, in which the United States Supreme Court found that a Maine statute that required employers to make a one-time severance payment to employees working at a plant if the plant closed was not preempted by ERISA, because "[t]he requirement of a one-time, lump-sum payment triggered by a single event" did not require the employer to set up 'an administrative scheme to meet its contingent statutory obligation,'" Id. at 12, 14–15.

At the same time, the PSAP herein does not require the level of ongoing administration present in Bogue v. Ampex Corporation, 976 F.2d 1319 (9th Cir.1992) (Wisdom, J., sitting by designation). In Bogue, the employer established a program in which it would provide certain executives severance benefits in the event the employees were not offered "substantially equivalent employment" once the employer was sold to another company. Bogue, 976 F.2d at 1321. Under the arrangement, the purchasing company was to determine if the new employment offered to an executive was substantially equivalent to the position the executive previously held. Id. The court found that even though the plan was triggered by a single event, that event "would occur more than once, at a different time for each employee," "the program's administration required a case-by-case, discretionary application of its terms," and "there was no way to administer the program without an administrative scheme." Id. at 1323. Thus, Bogue held an ERISA plan did exist. Id.

The PSAP herein falls somewhere in between, as did the deferred compensation plan in

9

Cantrell. In Cantrell, the husband and wife plaintiffs merged their certified public accounting firm with another firm, pursuant to an employment agreement which provided significant deferred compensation as compensation for the value of their firm given in the merger. 728 F.3d at 445. The ultimate deferred compensation amount was to be calculated using a formula multiplying the employee's average compensation multiplied by his or her vested percentage, not to exceed a cap. Id. at 446. It was subject to forfeiture for competing with the employer or for termination with cause. Id. at 447. Following the wife's departure from the employer firm (four years after her husband had departed to practice law), the new firm determined that the Cantrells had violated the non-compete clause, and thus forfeited their right to deferred compensation. Id. at 447-48. The Cantrells filed separate lawsuits in Texas state court to recover the deferred compensation payments, and the defendant removed the suits to federal court arguing that agreements were governed by ERISA, preempting the state law claims. Id. The district court agreed with the defendant, but the Fifth Circuit reversed, finding that no ERISA plan existed. In so finding, the Fifth Circuit emphasized that the amount of deferred compensation, which was to be paid quarterly over ten years, was "'based on a one-time calculation using a fixed formula,' and writing a check each quarter 'is hardly an administrative scheme.'" Id. at 451 (quoting Tinoco v. Marine Chartering Company, Inc., 311 F.3d 617, 622 (5th Cir. 2002). "In other words, 'the pre-determined benefit, even when paid over time, [does] not amount to an administrative scheme.'" Id. (quoting Peace v. Am. Gen. Life Ins. Co., 462 F.3d 437, 441 (5th Cir. 2006)).

      The court also noted that "[u]nlike the compensation arrangement at issue in Bogue, the Cantrells' deferred compensation arrangements neither involve discretionary decisions, such as

deciding whether an employment offer is for 'substantially equivalent employment,' nor explicitly give the employer, authority to make such discretionary decisions." Id. (comparing Bogue, 976 F.2d at 1321). The court specifically stated that though the employer "asserts it used discretion to determine whether [plaintiff] was 'terminated with cause,' we reject the notion that this is enough to necessitate an ongoing administrative scheme." Id. Moreover, "the amount and duration of payments [in Cantrell was] fixed, the amount due [did] not depend on decisions made in underlying ERISA plans, and the deferred compensation agreements did not reference administrative procedures that must be followed." Id. (comparing Crowell v. Shell Oil Company, 541 F.3d 295, 305–306 (5th Cir. 2008)).

Also instructive is Tinoco v. Marine Chartering Company, Inc., in which the Fifth Circuit applied Fort Halifax to an arrangement to pay for two employees to receive health care benefits until the employees became eligible for social security benefits. 311 F.3d 617, 618–19. Under the arrangement, if the employer merged with another company, the payments became explicit severance payments due upon retirement or termination, which the employees could elect to receive as a lump-sum payment or a stream of payments. Id. at 619, 622. Because regardless of how the employee chose to receive the payments, the total amount to be paid was based on a one-time calculation using a fixed formula, the court found that the arrangement did not constitute an administrative scheme. Id. at 622. The Fifth Circuit found it especially significant that the employer provided no evidence that the agreement required an administrative scheme to make ongoing discretionary decisions based on subjective criteria. Id. The court further noted that simply because the employer offered the employees the option of receiving their payment

11

over a period of time, that did not make it an administrative scheme. Id. (citing Fontenot v. NL Industries, Inc., 953 F.2d 960, 961 (5th Cir.1992)).

Applying these precedents, the court finds that the PSAP, which is no longer in existence, does not require an ongoing administrative scheme. Calculation of the amounts due under it were made once per year, and were not complex, but rather fixed, straightforward mathematical calculations typical of similar employee compensation arrangements. Although no payments were ever made, if made, they are payable to one individual in either a lump sum or three equal annual payments. As in Tinoco, there is no evidence that the agreement required an administrative scheme to make ongoing discretionary decisions based on subjective criteria. The only potential for the exercise of discretion was the need for a determination whether the plaintiff was terminated for cause, which the Cantrell court has specifically singled out as being insufficient to necessitate an ongoing administrative scheme. That is even more true in this case in which the bases for a cause termination were limited and prescribed by the terms of the PSAP. Further, the PSAP does not include any procedures for handling claims or appeals. Finally, while not determinative, the court notes that the PSAP does not reference ERISA and calls for the application of state law – a position inconsistent with defendant's position that it was drafted as an ERISA plan.

*A reasonable person cannot ascertain procedures for receiving benefits under the PSAP*.

The third Dillingham factor requires a reasonable person to be able to determine from surrounding circumstances the procedures for receiving benefits. Dillingham, 688 F.2d at 1374. The PSAP makes no mention of a procedure for receiving benefits or for review or appeal of a

denied claim. However, as argued by defendant, "[a] specific claims procedure need not be set out in writing in order for the third Dillingham factor to be satisfied." Hughes v. Zurz, 298 F. App'x 404, 414–15 (6th Cir. 2008) (citing Dillingham, 688 F.2d at 1372 ("ERISA does not, however, require a formal, written plan.")). Rather, courts have been willing to accept past practices regarding the pursuit of claims as evidence of the existence of a procedure for receiving benefits. Id. "In particular, when prior requests for benefits have been awarded as the result of a plaintiff taking action to present his claim to a plan administrator, courts have found that a reasonably ascertainable claims procedure exists." Id. (citing Deibler v. UFCW, 973 F.2d 206, 210 (3d Cir.1992); Whitfield v. Torch Oper. Co., 935 F. Supp. 822, 828 (E.D. La.1996). A "reasonable employee [can] ascertain the procedure for receipt of benefits where informal procedures are in place or where the experiences of other employees made the process apparent." Monk v. Performance Contractors, Inc., 2010 WL 5175040, at *4–5 (W.D. La. Dec. 6, 2010). However, case law provides little guidance in cases where there have been no previous claims processed or benefits awarded. Hughes, 298 F. App'x at 415.

      That is the posture of the present case. Plaintiff received a letter on December 30, 2019, informing him that he was terminated and that his PSAP account was forfeited. The letter, like the PSAP itself, did not include any procedure for appealing the decision. Plaintiff was the sole participant in the PSAP, and did not have the prior experiences of other colleagues as a reference to indicate what procedures might exist to process or appeal his claim.

      Defendant argues that a second letter, sent to the plaintiff on July 16, 2020 after being provided a courtesy copy of the lawsuit, constitutes a "claim denial letter" that set forth appeal

rights. However, the court finds that defendant cannot retroactively establish a claims procedure via a post-hoc supplementation to the plan, after the filing of suit, and nearly seven months after the termination letter which stated the benefits were forfeited. At the time of the alleged forfeiture, and the filing of suit, there was simply no information within the PSAP, or to be gleaned from the prior experience of similarly situation colleagues, as to how to process a claim or appeal a decision. On this record, the court finds that a reasonable person could not ascertain the procedures for receiving benefits under the PSAP, or appealing their denial, short of filing a lawsuit for lost wages, or alternatively, for breach of contract, which is what plaintiff did.

This finding is in accord with another case from this district that involved an agreement to pay post-retirement income to an employee, or pre-retirement death benefits to his designated beneficiary, Mothe v. Mothe Life Ins. Co., 2011 WL 1113284, at *3 (E.D. La. Mar. 23, 2011). In Mothe, the court found that while the agreement included the source of financing for the benefits, it did not include the necessary procedures for receiving benefits. Specifically, the court stated:

> A reasonable person cannot ascertain the procedures for receiving benefits under the Agreement in question. The Agreement does not contain a procedure for obtaining post-retirement income, nor is the information provided in a supplemental document presented in the record before this Court. Furthermore, although the Agreement indicates a procedure by which Emile Mothe can identify a designated beneficiary to receive the death benefits, neither the Agreement nor any supplemental document presented in the record indicates the procedure for obtaining benefits after an individual has been named as a beneficiary. Moreover, the Agreement does not set forth a procedure for review or appeal of a denied claim. Based on the foregoing analysis, no ERISA plan existed.

Id.

Accordingly, in addition to its failure to establish an ongoing administrative scheme, defendant has failed satisfy the third <u>Dillingham</u> requirement for existence of a plan -- reasonably ascertainable procedures for receiving benefits.

## CONCLUSION

Based on the foregoing, the court finds that the PSAP in this case does not constitute an ERISA plan, therefore no basis exists to preempt plaintiff's state law claims or to exercise federal jurisdiction, and accordingly,

**IT IS HEREBY ORDERED** that plaintiff's **Motion to Remand** (Rec. Doc. 9) is **GRANTED**, and this matter is **REMANDED** to the Civil District Court for the Parish of Orleans.

New Orleans, Louisiana, this  22nd  day of September, 2020.

_____
**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**